STEPHEN MORSE, by his committee, *vs*. THE ERIE
RAILWAY COMPANY.

It is negligence, in a person driving a team to approach a railway crossing
without looking to see whether a train is coming.

The plaintiff was approaching a railroad crossing, driving at a dangerous rate
a pair of young, high-lived horses, one of them afraid of the cars, just as a train
of cars was passing. He looked neither to the right nor left, but straight
ahead, apparently striving to hold his team, and disregarded a warning given
him, of the impending danger. In an action to recover for injuries occasioned
by a collision with the locomotive; *held* that the plaintiff was guilty of
negligence in approaching a crossing at so rapid a rate of speed as to render
it difficult, if not impossible, after discovering the danger, to stop his team
before the train arrived; in not looking for a passing train; and in not ob-
serving, or disregarding, the warning given. And that he was therefore
properly nonsuited.

TALCOTT, J., dissented, on the ground that there was evidence sufficient to go to
the jury.

THIS action was brought to recover for injuries sus-
tained by the plaintiff through the negligence of
the defendant's employees, who were employed in run-
ning a train of cars on its road, which struck the plain-
tiff and injured him so that he became insane, and injured
a pair of horses he was driving.

The accident occurred on the 20th of September, 1865,
near the village of East Gainesville, in the county of
Wyoming. The plaintiff and his wife were in a two
horse lumber wagon, going from Gainesville south.
The horses attached to the wagon were six years old,
well broke; one of them very much afraid of the cars.
The plaintiff stopped to water his horses at the pump in
front of the hotel, some 628 feet from the crossing of the
highway over which he was driving and the railroad
track. After watering, he drove down to the crossing,
when his wagon was struck by the defendant's engine,
the horses injured, the wagon broken, the plaintiff him-
self seriously injured and his wife killed.

The road on which the defendant was driving runs
nearly parallel to the railroad. The angle of divergence

at the crossing only six or eight degrees. The first that can be seen of a train coming from the north, in which direction the train that injured the plaintiff was moving, by a person going from the tavern to the crossing, is where it is within about 720 feet of the crossing, as there is a cut which hides the train until within the distance last mentioned. There are, on the west side of the highway leading to the crossing, six buildings, which prevent a train being seen after leaving the cut, until it reaches the crossing. The interruption is not constant during the whole distance, but only while passing the buildings. The first is a hotel, with shed and barn attached. The next is a dwelling-house; the next a car house, wood shed and water tank; and lastly, the station. The station is 157 feet from the place of the collision. The station is 75 feet long, wood shed, tank, &c., 67 feet; the dwelling-house 24 feet. The length of the hotel, barn, &c., is not given. When the plaintiff approached the station the train had just come out of the cut. As he passed behind the station, he was about 240 feet from the point of collision. The station being 75 feet long, he was only 165 feet from it when he had cleared the station.

The signal post is 67 feet from the point of collision; and on the east of the highway there is an embankment or hill so near the margin of the highway that it is dangerous, if not impossible to turn round a team on the highway; and to climb the bank is to incur the risk of turning over the wagon.

The train, being a light one, did not make as much noise as a larger one. Some of the witnesses say that neither a bell was rung nor whistle sounded, and others say the only signal given was sounding the whistle immediately before the collision occurred.

The defendant's witnesses testify that the plaintiff drove down the hill at a fast trot, some six or eight miles per hour, not looking to the right or left, but straight

ahead, apparently striving to hold his team. One wit-
ness testified that, apprehending a collision, he shouted
to the plaintiff and tried to stop him, but he paid no
attention to him. The tail-board of the wagon box was
loose, and made a good deal of noise. Some of the
witnesses thought that if the plaintiff had been driving
slow, he might have stopped and turned the team after
discovering the train. Others think it was doubtful;
especially with a horse that was afraid of the cars.
There can be no doubt but that the defendant was guilty
of negligence.

The court nonsuited the plaintiff, and ordered the ex-
ceptions to be heard in the first instance at the General
Term.

*By the Court,* MULLIN, P. J.   The Court of Appeals
has held it to be negligence in a person driving a team
to approach a railway crossing without looking to see
whether a train s approaching. (*Gorton* v. *Erie Rail-
way Co.*, 45 *N. Y.* 660.) This the plaintiff did not do.
Again; he drove at a dangerous rate, a pair of young,
high-lived horses, while approaching the crossing, ren-
dering it difficult if not impossible, after discovering the
danger, to stop them before the train arrived. He dis-
regarded the warning that one of the witnesses gave him
of the impending danger, if he heard or saw the person
who gave it. If he did not, it was because he was not
observant of what was occurring on either side of the
highway; whereas he should have given his attention
thereto; especially as he was approaching a place of
danger. These facts are not disputed; indeed some of
them are sworn to by the plaintiff's own witnesses.

The only answer that could be given to them, that
occurs to me, is, that it was impossible for him to see
the train, by reason of the intervening houses, until he
was so near the track that it would have been impos-
sible to stop his team and escape the collision, no matter

what amount of care and caution he had exercised. The witnesses differ as to the distance from the track a train approaching from the north could be seen after passing behind the station. Some say the train can be seen 60 feet from the track; others from 15 to 30 feet.

If the plaintiff had been driving at a moderate rate of speed, he could have stopped his team within even the shortest distance. It is true he might be incurring as great danger from his horses, if he attempted to stop close to an engine in motion as by encountering a collision of the train. But in the one case absolute destruction was certain, in the other escape was possible.

The court was right in nonsuiting the plaintiff; and the motion for a new trial must be denied, and judgment ordered for the defendant, on the nonsuit.

TALCOTT, J., dissented, on the ground that there was evidence sufficient to go to the jury.

New trial denied.

[FOURTH DEPARTMENT, GENERAL TERM, at Buffalo, June 3, 1873. *Mullin, Talcott* and *E. D. Smith,* Justices.]